**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GREAT AMERICAN INSURANCE COMPANY OF NEW YORK,** | ) | |
| **Plaintiff/Counter-Defendant,** | ) | **No. 1:18-cv-8483** |
| **v.** | ) | **Judge Jeffrey I. Cummings** |
| **KOCH FOODS, INC.,** | ) | |
| **Defendant/Counter-Plaintiff.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Great American Insurance Company of New York ("Great American") brings this action against policyholder Koch Foods, Inc. ("Koch") following a 2016 explosion at a Koch feed mill (the "Feed Mill") located in Rockmart, Georgia for which Great American provided a first-party property insurance policy (the "Excess Policy"). (Dckt. #49). Great American seeks rescission of that policy or, in the alternative, a declaration that the Excess Policy does not cover the explosion loss because Koch's underlying primary insurance was not exhausted.

Before the Court is Great American's motion for summary judgment, (Dckt. #146), in which it argues that it is entitled to summary judgment on: (1) its rescission claim because Koch materially misrepresented the value of its insured property and potential loss exposure; (2) its declaratory judgment claim because Koch did not exhaust its primary insurance policy; and (3) its request to exclude $5.6 million in depreciation expenses from Koch's damages. (Dckt. #147). Koch opposes Great American's motion and cross-moves for summary judgment on the issues of exhaustion and depreciation expenses, arguing that: (1) genuine issues of material fact preclude Great American's motion for summary judgment on its rescission claim; (2) the court already

rejected Great American's exhaustion argument; and (3) Great American's exhaustion and depreciation arguments fail as a matter of law. (Dckt. #159).

For the reasons set forth below, the Court denies Great American's motion for summary judgment on its rescission claim and exhaustion claim; grants Koch's motion for summary judgment on these two claims; grants Great American's motion for summary judgment on the issue of depreciation; and denies Koch's motion for summary judgment on the same. (Dckt. ##146, 159).

## I. PROCEDURAL BACKGROUND

On December 27, 2018, plaintiff Great American filed a lawsuit against Koch seeking contract rescission and declaratory judgment. (Dckt. #1). On April 5, 2019, Arch Specialty Insurance Co. ("Arch") filed a complaint against Koch alleging the same claims, (Dckt. #39-1), and on April 15, 2020, the court consolidated the two cases, (Dckt. #40). On June 2, 2020, Great American and Arch filed a joint amended complaint, which is now the operative Complaint in this matter. (Dckt. #49). On June 23, 2020, Koch filed an answer to plaintiffs' Complaint and counterclaims against each plaintiff for declaratory judgment, breach of contract, and violation of Section 155 of the Illinois Insurance Code. (Dckt. #50). On October 12, 2020, Arch and Koch stipulated to a voluntarily dismissal of the actions between them. (Dckt. #56).

After proceeding through fact discovery on the question of liability, plaintiff Great American filed its first motion for summary judgment on April 15, 2022. (Dckt. #81). Koch filed its response on April 3, 2023. (Dckt. #97). On June 6, 2023, the court denied Great American's motion for summary judgment on its exhaustion claim. (Dckt. #110 at 6–7). Great American withdrew the remainder of its motion and filed a new motion for summary judgment, the one now before this Court, on January 31, 2025. (Dckt. #146).

## II. LEGAL STANDARD

### A. Standard for Summary Judgment

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Pfalzgraf v. Rusk Cnty., Wis.*, 187 F.4th 507, 512 (7th Cir. 2026). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 584 (7th Cir. 2021) (the existence of a factual dispute between the parties will not preclude summary judgment *unless* it is a genuine dispute as to a material fact).

When the moving party has met its burden, the non-moving party cannot rely on "conjecture and conclusions" to concoct factual issues. *Johnson v. Ridge Tool Mfg. Co., Inc.*, 186 F.4th 478, 489 (7th Cir. 2026). Instead, it must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248. Of course, "[i]t is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which [it] relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

In determining whether a genuine issue of material fact exists, all facts and reasonable inferences must be drawn in the light most favorable to the non-moving party. *King v. Hendricks*

*Cnty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). Ultimately, summary judgment is granted only if "no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (cleaned up).

**B. Requirements of Local Rule 56.1**

Northern District of Illinois Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this District. The rule is intended "to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (cleaned up). To this end, Local Rule 56.1(a) requires the moving party to provide a statement of material facts that complies with Local Rule 56.1(d). LR 56.1(a)(2). In turn, Local Rule 56.1(d) provides that "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it." LR 56.1(d)(2).

The non-moving party must then respond to the movant's statement of material facts. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); LR 56.1(e). The response must consist of numbered paragraphs corresponding to the numbered paragraphs in the moving party's Local Rule 56.1 statement, and each response "must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact." LR 56.1(e)(1)–(2). "A response may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made." LR 56.1(e)(2). Instead, if the opposing party wishes to assert facts not set forth in the moving party's Local Rule 56.1 statement, it may submit a statement of no more than forty additional material facts, which also must comply with Local Rule 56.1(d). LR 56.1(d)(2), (5). If a party fails to respond to the Rule 56.1 statement of material facts, those facts may be deemed admitted to the extent they are supported by the

evidence in the record. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012); *Parra v. Neal*, 614 F.3d 635, 636 (7th Cir. 2010); LR 56.1(e)(3).

**1. David Stegall's Testimony Is Admissible.**

Great American disputes certain facts in Koch's Local Rule 56.1 statement by arguing that David Stegall's opinion is inadmissible "for the reasons stated in Great American's motion." (*See* Dckt. #165 ¶¶8–9, 19–20). A response to a party's Local Rule 56.1 statement may assert legal arguments to make objections based on admissibility. LR 56.1(e)(2). "[T]he party's argument that the offending material should not be considered should be included in its response or reply brief." *Id.* But "[i]n the event that the objection is overruled, the failure to admit or dispute an asserted fact may constitute a waiver." *Id.*

As a preliminary matter, Koch correctly notes that Great American submitted no rebuttal to Stegall's report and did not separately move to exclude his opinions. (Dckt. #159 at 10). Nonetheless, the Court will consider Great American's arguments to exclude Stegall's testimony because the Court instructed Great American not to file a separate motion at the parties' August 26, 2024 status hearing, and because Koch may rely only on admissible evidence (inclusive of expert testimony) to fend off Great American's summary judgment motion. *See Lewis*, 561 F.3d at 704.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Haley v. Kolbe & Kolbe Millwork Co.*, 863 F.3d 600, 611 (7th Cir. 2017). Pursuant to Rule 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702 delegates to district courts the responsibility of ensuring that expert testimony is both reliable and relevant. *Daubert*, 509 U.S. at 598. When fulfilling this gatekeeping role, courts in the Seventh Circuit evaluate: "(1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (emphasis added).

Great American challenges the second prong of admissibility: the reliability of the expert's methodology. Expert opinions are sufficiently reliable when they are based on sound methodology and can be properly applied to the facts. *Daubert*, 509 U.S. at 592–93. This inquiry is "'necessarily flexible' and the court has broad latitude in its determination of reliability." *Est. of Damiani v. Allen*, 4:16-cv-00053-RLY-DML, 2018 WL 4095080, at *5 (S.D.Ind. Aug. 28, 2018), *quoting Robinson ex rel. Irwin v. City of Madison*, No. 15-cv-502-jdp, 2017 WL 564682, at *8 (W.D.Wisc. Feb. 13, 2017). Indeed, the Seventh Circuit has recently reaffirmed that even "'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Johnson*, 186 F.4th at 484, *quoting Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). The Seventh Circuit has urged courts not to "subsume the jury's essential role as the arbiter of the weight and credibility of expert testimony. . . . Determinations on admissibility should not supplant the adversarial process." *Johnson*, 186 F.4th at 484 (cleaned up). Ultimately, whether to admit expert testimony rests within the discretion of the court. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

Great American asserts that Stegall's opinions are inadmissible because they are purely "speculative" and factually unsupported. (Dckt. #147 at 14–16). In support of this argument, Great American highlights testimony from Stegall's deposition, arguing that: Stegall (1) "had no idea" how Koch's statement of values was calculated, (*id.* at 14); (2) "agreed that it 'may very well be true' that Koch was careless or negligent in preparing its statement of values," (*id.* at 15); and (3) put forth speculative reasons, which conflicted with other evidence in the record, about how Koch prepared its statement of values and why, (*id.* at 14–16).

Great American's arguments are unavailing for two reasons. First, other than the assertion that Stegall "had no idea" how Koch calculated its statement of values, Great American's arguments go to the credibility and accuracy of Stegall's testimony, not the reliability of his methodology. *See Gopalratnam*, 877 F.3d at 781 ("An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt.") (cleaned up). To the extent that Great American seeks to call into question Stegall's credibility, that is "a question for the jury, not the court." *United States v. Andrews*, 172 F.4th 960, 969 (7th Cir. 2026). "A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy. If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). Instead, as the Seventh Circuit has noted, "[t]he crucible of cross-examination should reveal the expert's blemishes." *Johnson*, 186 F.4th at 484.

Second, each fact that Great American highlights to attack the admissibility of Stegall's testimony is properly disputed in Koch's response to Great American's Local Rule 56.1 statement. For example, Great American cherry-picks soundbites from Stegall's deposition to suggest that Stegall "just looked at the statement of values" without further analysis, (*see* Dckt.

#147 at 14), but Koch points out that Stegall "had multiple conversations with Koch's CFO," Lance Buckert, "who prepared the statement of values," (Dckt. 156 ¶81). Koch also cites the numerous materials that Stegall reviewed when preparing his expert report, which included Buckert's deposition transcript and Koch's discovery responses—two documents that "described in detail how Koch prepared the statement of values." (*Id.*) (citing Dckt. #155-6 at 41). And similarly, Koch identifies specific deposition testimony from Stegall to dispute Great American's other assertions about Stegall's testimony concerning what factors underwriters consider when preparing a statement of values. (Dckt. #156 ¶¶87, 91, 92).

"[T]he *Daubert* framework when assessing the reliability of an expert's testimony is a flexible one," and defendants fail to show that Stegall's methodologies fall short of this standard. *Mihailovich v. Laatsch*, 359 F.3d 892, 919 (7th Cir. 2004). Accordingly, the Court in its discretion finds that Stegall's opinions are admissible, and that Great American has thus admitted the facts that it disputed based only on the inadmissibility of Stegall's testimony.

## III. FACTUAL RECORD

The Court draws the factual record from the parties' pleadings; Great American's statement of material facts ("PSOF") and its accompanying exhibits, (Dckt. ##148 and 146-1 to 146-43); Koch's response to PSOF, ("PSOF Resp."), (Dckt. #156); Koch's statement of additional facts ("DSAF") and its accompanying exhibits, (Dckt. ##155 and 155-1 to 155-17); and Great American's response to DSAF ("DSAF Resp."), (Dckt. #165). The following facts are undisputed unless otherwise noted:

### A. Koch and Its Policy Coverage

Koch is a vertically integrated poultry business that "hatches, raises, feeds, slaughters, and processes chickens through Koch's own operations." (DSAF ¶1). Koch's hatcheries and feed mills supply its own facilities. (*Id.*). On February 7, 2016, an explosion occurred at a Koch

feed mill located in Rockmart, Georgia, resulting in property damage and business interruption. (Dckt. #50 ¶30). Shortly after the explosion occurred, Koch notified its insurers of the loss. (*Id.* ¶31).

For the period from May 1, 2015 to May 1, 2016, Koch insured its properties on a "blanket" basis: "rather than have separate policy limits for each of its approximately 90 locations, Koch purchased insurance that covered all locations up to a single blanket limit." (DSAF ¶4). For the 2015–2016 coverage period, Koch reported a total insured value of $661,528,458. (PSOF ¶21).

Koch obtained $250 million of first-party property and business interruption insurance for its properties nationwide. (*Id.* ¶15). That insurance consisted of a $50 million primary layer of insurance and a $200 million excess layer. (*Id.*). The primary layer was composed of eleven insurance policies issued by nine different carriers, (*id.* ¶16), while the excess layer was composed of three policies issued by three different carriers, including Great American, (Dckt. #146-26 at 3). Each of the eleven underlying policies included or was subject to a "manuscript form," meaning that each included certain consistent provisions about loss payment, claims settlement, and other provisions. (PSOF ¶¶18–19). Great American's Excess Policy is a follow form policy expressly "subject to the same terms and conditions" as the underlying primary policies. (*Id.* ¶21).

The excess policy issued by Great American provides that the policy "will pay for loss or damage only when the amount of covered loss or damage arising out of any one occurrence exceeds the sum of $50,000,000, and the limits of all underlying insurance, regardless of sublimits, have been exhausted by payment of loss or damage." (PSOF ¶22). The policy further provides that "[t]he most this policy will pay for loss or damage in any one occurrence is the Limit of Insurance of $80,000,000." (*Id.*). Great American's excess policy states that

"[c]overage is provided for covered property . . . as per the schedule on file with this company as of 04/29/15 with total insured values of $661,528,458." (*Id.* ¶21) (cleaned up).

**B. Preparing the Statement of Values**

As part of each insurance renewal, Koch provided its brokers and insurers with information about its operations, including a statement of values. (DSAF ¶5). Koch listed the following insured values for the Rockmart Feed Mill in its 2015–2016 statement of values: $13 million for real property, $2 million for personal property, $3 million for inventory, and $2 million for business interruption/income ("BI"). (PSOF ¶27). The statement of values also listed a risk value for BI across all locations of $114,689,372, (*id.*), and a total insured value across all locations of $661,528,458, (DSAF ¶8).

The parties agree about several aspects of how the statement of values was prepared. To begin, Great American does not properly dispute that Koch's method of reporting values for the 2015–2016 insurance renewal was consistent with industry custom and practice. (DSAF Resp. ¶8). The parties agree that, per custom and practice in the insurance industry, the BI figure in a statement of values is meant to capture both business income and extra expense. (PSOF Resp. ¶83). They also agree that Koch calculated the real property and personal property values of each property using historical construction costs, (*id.* ¶28), and that Koch calculated the BI values of each property by reporting an entire year's worth of projected book income and allocating that total to Koch's various properties, (DSAF Resp. ¶7). The parties dispute, however, the extent to which that allocation was arbitrary, (PSOF Resp. ¶29; DSAF Resp. ¶7), and whether Koch reported business income values that also included coverage for extra expenses, (PSOF ¶¶36–37; Dckt. ##147 at 8; 159 at 12).

The parties also disagree about how insurers use a statement of values during the underwriting process. Great American presents underwriter testimony that, even when

underwriting a blanket policy, an underwriter decides on an attachment point (i.e., the dollar value of a loss at which Great American's liability as an excess insurer begins) by reviewing each individual location in a statement of values to determine whether its insured value could "pierce" a proposed attachment point. (PSOF ¶44). Koch, in contrast, presents evidence from its insurance expert that, when an insurer underwrites a blanket policy, "the total reported values of all locations is of paramount concern as opposed to the reported values of individual locations." (DSAF ¶¶8–9).

**C. Koch Claims Payment**

After the explosion at the Feed Mill, Koch sought payout from its primary insurers. One of the carriers providing primary insurance to Koch, International Insurance Company of Hannover SE ("Hannover"), issued two policies with a combined limit of $4,875,000. (PSOF ¶57). Hannover disputed the full payout of its policies due to the presence of "loss occurrence limit of liability endorsements" contained in the policies, ultimately settling to pay $1,750,000 to Koch in full discharge of its obligations. (*Id.* ¶59). Koch recovered the remaining $3,125,000 of the Hannover policies from its brokers Alliant Insurance Services, Inc. ("Alliant") and R-T Specialty, LLC ("RT"). (*Id.* ¶60).

Koch is currently claiming over $85,473,000 in damages, including $50 million in extra expenses and over $28 million in rebuild costs. (PSOF ¶73). Koch still seeks $35,473,000 in damages from its excess insurers. (Dckt. #146-25).

**D. Subsequent Changes in Coverage**

Koch reported higher loss exposure and insured property values after the explosion at the Feed Mill. For the 2016–2017 program, Koch's total insured value increased from $661 million to over $1 billion. (PSOF ¶53). In 2018, Koch prepared a spreadsheet stating that extra expense

exposure for each of its feed mills valued $30 million annually. (*Id.* ¶31). And by 2020, Koch was reporting total insured values exceeding $2 billion. (DSAF ¶54).

Great American, in turn, adjusted its coverage over time. When Koch first obtained the Feed Mill as part of a larger acquisition in 2012—at which point the Feed Mill was valued at over $30 million—Great American provided excess coverage attaching at $25 million. (DSAF ¶17). For the 2015–2016 program, Great American attached at $50 million, but in subsequent years, Great American changed its attachment point to $75 million, then $150 million, then $200 million. (PSOF ¶52). Great American also adjusted its premiums as Koch insured additional assets. After the 2012 acquisition that included the Feed Mill and totaled nearly $80 million in assets, Great American added $3,382 to Koch's annual premium. (DSAF ¶18). In 2012, Great American charged Koch $109 to increase Koch's total insured values by $2.8 million; in 2014, Great American charged Koch $41 to add a new location with an insured value of $5 million; and in 2016, Great American charged Koch $820 to add locations with values exceeding $11 million. (*Id.*).

## IV. DISCUSSION

The parties agree that Illinois substantive law applies in this diversity case. *See, e.g.*, *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir.2006) ("When a district court sits in diversity, it must apply the choice of law principles of the forum state to determine which state's substantive law governs the proceeding.").

### A. Great American Is Not Entitled to Summary Judgment on Its Rescission Claim.

Great American first moves for summary judgment on its rescission claim, arguing that it is entitled under Section 154 of the Illinois Insurance Code to rescind the Excess Policy because of material misrepresentations made by Koch in its statement of values. (Dckt. #147 at 6–16).

In Illinois, rescission of an insurance policy is governed by the Illinois Insurance Code, which states:

> No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance, or breach of a condition of such policy shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor. No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company.

215 ILCS 5/154.

Although Great American does not argue that Koch acted with any intent to deceive, it does assert that Koch included material misrepresentations in its written application materials. Koch responds that genuine questions of material fact remain as to whether it made any misrepresentations and, if it did, whether any misrepresentations it made were material. For the following reasons, the Court agrees with Koch.

**1. There Are Questions of Material Fact as to Whether Koch Misrepresented Information in Its Insurance Application Materials.**

"A misrepresentation in an application for insurance is a statement of something as a fact which is untrue and affects the risk undertaken by the insurer." *Methodist Med. Cent. of Ill v. Am. Med. Sec. Inc.*, 38 F.3d 316, 319–20 (7th Cir. 1994). "Incomplete answers or a failure to disclose material information on an application for insurance may constitute a misrepresentation when the omission prevents the insurer from adequately assessing the risk involved." *Methodist*, 38 F.3d at 320. Whether a misrepresentation occurred is determined objectively, on the basis of the facts known to the insured at the time of application, regardless of the insured's subjective belief as to the truth of the representations. *Ratcliffe v. Int'l Surplus Lines Ins. Co.*, 550 N.E.2d 1052, 1057–58 (Ill.App.Ct. 1990). As such, whether information submitted on an application for

insurance constitutes a misrepresentation is generally a question of fact better suited for a jury. *Id.*

Great American points to four values that it claims Koch misrepresented in its 2015–2016 Statement of Values: (1) the "real property" value of the Feed Mill, (2) the total "real property" value across all Koch properties, (3) the "business income" value of the Feed Mill, and (4) the total "business income" value across all Koch properties. (Dckt. #147 at 7–10). The Court considers Great American's arguments in turn.

**a. Real Property Values**

Great American first argues that Koch misrepresented the "real property" value of its properties, including the Feed Mill,[1] because Koch calculated those values using "historical costs" rather than replacement costs. (Dckt. #147 at 8) (citing PSOF ¶28). Koch does not dispute that it calculated real property values for the 2015–2016 renewal period using historical costs, but it argues that this method of calculation comported with industry custom and practice, relying on an unrebutted expert report from insurance expert David Stegall. (Dckt. #159 at 10–11) (citing Dckt. #155-6 at 10).

Great American offers two unpersuasive counterarguments in response. It first argues that Stegall admitted that "replacement cost value should be based on what it would cost in today's dollars to repair or replace the property with like kind and quality." (Dckt. #166 at 5). This argument is inapt: the fact that the parties agree *now* about how to calculate replacement costs does not eliminate genuine questions of material fact as to whether Koch "objectively" misrepresented the real property value of its properties, "on the basis of the facts known to the

[1] Koch reported the construction cost of the Feed Mill as $13 million, but Great American argues that the true "real property" value of the Feed Mill was $28 million, presumably based on the rebuild costs Koch sought after the explosion at the Feed Mill. (Dckt. #147 at 9; PSOF ¶73).

insured at the time," by relying on historical costs. *W. World Ins. Co. v. Majercak*, 490 F.Supp.2d 937, 941 (N.D.Ill. 2007). Second, Great American argues that "Koch knew it had been reporting the wrong [real property] values to its insurers," citing a post-explosion email from May 2016 in which Koch's COO stated that Koch "had to take a fresh look at our statement of values and put more of a replacement cost on assets vs the acquisition costs." (Dckt. #166 at 6; PSAF ¶55). But Koch's decision to change valuation practices for a *subsequent* renewal cycle neither establishes pre-incident knowledge or intent nor eliminates genuine issues of fact about whether the insured party misrepresented information based on facts it knew "at the time of the policy application." *Ratcliffe*, 550 N.E.2d at 1057.

The Court thus finds that a genuine issue of fact exists as to whether Koch misrepresented real property values on its 2015–2016 statement of values.

**b. Business Income Values**

Great American next argues that Koch misrepresented the BI value of its properties, including the Feed Mill, because Koch excluded "extra expenses" and "continuing operating expenses" from its BI valuations. Because these misrepresentations persisted across all Koch's calculations, Great American contends, the total BI value across all Koch properties—reported as $114 million—was actually at least $1 billion, and the BI value for the Feed Mill that Koch reported as $2 million was actually at least $30 million. (Dckt. #147 at 8, 11). Koch argues, once again, that its means of calculating its business income comported with industry custom and practice for blanket insurance policies. (Dckt. #159 at 10–14). For the reasons below, the Court finds that genuine issues of fact remain as to whether Koch misrepresented its BI values.

Great American's contention that Koch misrepresented its extra expense exposure cannot support plaintiff's motion for summary judgment. Although the parties agree that, per industry custom and practice, Koch's BI values *should* capture both business income and extra expense,

(PSOF ¶83), Great American itself highlights conflicting factual evidence on the record about whether or not Koch included extra expense exposure in its BI valuations, (*see* Dckt. #147 at 8–9). Great American's other arguments about misrepresentations in Koch's BI values are similarly unpersuasive. Great American points to testimony about "arbitrariness" in the allocation of Koch's total BI value across Koch's properties, (Dckt. #147 at 7–8; PSOF Resp. ¶29), as well as an undisputed document showing that Koch valued extra expense exposure for each of its feed mills at $30 million after the 2016 explosion, (Dckt. #147 at 8). But any disputed arbitrariness does not eliminate questions of material fact about whether Koch "objectively" misrepresented its properties' BI values, and post-explosion evidence cannot suffice to resolve questions of material fact about whether Koch misrepresented its properties' BI values "at the time of application." *Majercak*, 490 F.Supp.2d at 941.

Genuine issues of fact also remain as to whether Koch should have included continuing operating expenses in its BI valuation. As stated above, Great American fails to dispute that Koch's reporting practices were consistent with industry custom and practice. The only evidence Great American cites supporting its contention that Koch should have reported continuing operating expenses on its statement of values is language in the manuscript policy form that Great American argues "defines business income as including continuing operating expenses." (Dckt. #166 at 7). But the language Great American points to defines "gross earnings," not business income, (Dckt. #146-27 at 50), and even if the policy *had* defined "business income," plaintiff fails to articulate how such a definition would bind Koch to a particular method of calculating BI on its statement of values.

The Court thus finds that genuine questions of material fact remain as to whether Koch misrepresented BI values on its 2015–2016 statement of values.

### 2. There Are Questions of Material Fact as to Whether Any Misrepresentations Koch Made Were Material.

For the reasons that follow, the Court finds that genuine questions of material fact also remain as to whether any of Koch's alleged misrepresentations were material.

To determine materiality, Illinois courts ask whether "reasonably careful and intelligent persons would have regarded the facts stated or omitted as substantially increasing the chances of the events insured against, so as to cause a rejection of the application." *Meier v. Pacific Life Ins. Co.*, 63 F.4th 595, at 600 (7th Cir. 2023) (cleaned up); *Am. Country Ins. Co. v. Mahoney*, 560 N.E.2d 1035, 1042 (Ill.App.Ct. 1990). "Ordinarily, the materiality of a misrepresentation is a question of fact; however, where the misrepresentation is of such a nature that all would agree that it is or is not material, the question is appropriate for summary judgment." *N. Life Ins. Co. v. Ippolito Real Estate Partnership*, 601 N.E.2d 773, 780 (Ill.App.Ct. 1992).

Great American contends that the misrepresentations it identifies were material because they affected Great American's decisions to: (1) participate as an excess insurer at the attachment point it did ($50 million), (Dckt. #147 at 11); or (2) issue the Excess Policy at all, (*id.* at 12). In support of this argument, Great American cites evidence that, with more information about the Feed Mill's exposure, Great American would have set a higher attachment point for its insurance policy—specifically, at a value higher than the stated value for the Feed Mill during the period in question. (Dckt. #166 at 8–9, 11). To this point, as Koch's exposure increased in subsequent years, Great American did move its attachment point for Koch from $50 million to $200 million. (PSOF ¶52).

But Koch cites several undisputed facts on the record that permit a reasonable inference that Koch's adjustments to individual property values would not affect Great American's premiums or issuance. (Dckt. #159 at 15–17). In particular, this evidence includes: documents

showing that in the past, Great American has provided excess coverage for the Feed Mill at an attachment point below its reported value, (DSAF ¶17); the marginal increases in Koch's annual premiums even after Koch increased its total insured values, (*id.* ¶18); and evidence from Stegall's expert report indicating that, per industry custom and practice, Great American would not have altered the terms of Koch's blanket insurance policy if Koch had adjusted the values of individual properties, (*id.* ¶¶19–20).

Unless "all would agree" that a misrepresentation is material, materiality is a quintessential question of fact for the jury. *Garde by Garde v. Country Life Ins. Co.*, 498 N.E.2d 302, 308 (Ill.App.Ct. 1986). Here, there remain genuine questions of material fact about whether any alleged misrepresentations by Koch were material to Great American's insurance decisions.

Accordingly, the Court denies Great American's motion for summary judgment on its rescission claim.

**B. Great American's Motion to Reconsider Its Exhaustion Claim Is Denied.**

In the alternative to its rescission claim, Great American argues that it is entitled to summary judgment on its exhaustion claim. (Dckt. #147 at 16–20). Specifically, Great American asserts that its Excess Policy is not triggered because Koch settled with one of its primary insurers below its policy limits, and thus failed to exhaust its underlying insurance policies. (*Id.* at 17).

As the parties both note, (*see* Dckt. ##147 at 20; 159 at 17), Judge Shah stated in his June 6, 2023 order partially denying Great American's motion for summary judgment that Koch's policy limits were "exhausted by payment as required by [the policy's] exhaustion clause, notwithstanding the fact that partial payment was not made by the primary insurer." (Dckt. #109). Judge Shah also found that "[t]he policy language does not require payment by a specific entity." (*Id.*). Great American's motion for summary judgment on its exhaustion claim thus

amounts to a motion to reconsider. A denial of summary judgment is an interlocutory order, not a final judgment, so plaintiff's motion to reconsider is governed by Federal Rule of Civil Procedure 54(b). *See Haze v. Kubicek*, 880 F.3d 946, 950 (7th Cir. 2018); *Galvan v. Norberg*, 678 F.3d 581, 587 n.3 (7th Cir. 2012).

Motions to reconsider an interlocutory order under Rule 54(b) are governed by the law of the case doctrine. *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571–72 (7th Cir. 2006). "The doctrine of law of the case precludes [the Court from] reexamining a previous ruling . . . in the same case unless it was manifestly erroneous." *Starcon Int'l, Inc. v. Int'l Bhd. of Boilermakers*, 450 F.3d 276, 278 (7th Cir. 2006). "[T]he law of the case doctrine embodies the notion that a court ought not to re-visit an earlier ruling in a case absent a compelling reason, such as manifest error or a change in the law, that warrants re-examination." *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007). While the law of the case doctrine "is not a straitjacket," a judge may reexamine the ruling of a judge previously assigned to the case "if he has a conviction at once strong and reasonable that the earlier ruling was wrong, and if rescinding it would not cause undue harm to the party that had benefited from it." *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1227–28 (7th Cir. 1995).

**1. Great American Timely Brings Its Motion to Reconsider.**

Koch first argues that Great American's motion to reconsider should be denied as untimely. (*See* Dckt. #159 at 17–18). This argument is without merit. Rule 54(b) provides that non-final orders "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities," so Great American has timely brought its motion to reconsider. Fed.R.Civ.P. 54(b).

**2. Great American Fails to Demonstrate a Manifest Error of Law or Fact.**

Notwithstanding the timeliness of its motion, Great American fails to present any new evidence or manifest error of law or fact that warrants reconsideration of the court's partial denial of summary judgment. The only new argument Great American raises attempts to distinguish *Trinity Homes LLC v. Ohio Casualty Insurance Co.* by describing the follow-form nature of Great American's Excess Policy. (Dckt. #147 at 19–20). But Great American's efforts constitute elaborations on the same arguments that this Court found unconvincing when considering Great American's first motion for summary judgment. (Dckt. #110 at 5). A motion to reconsider is not a vehicle for rehashing arguments the Court has already rejected. *Janusz v. City of Chicago*, 78 F.Supp.3d 782, 787 (N.D.Ill. 2015). Consequently, Great American's belated attempt to distinguish *Trinity* does not suffice to support its motion to reconsider.

**3. Great American Fails to Show that the Excess Policy Is Unambiguous.**

Even if Great American were not bound to the exacting standard of a motion to reconsider, its arguments that the Excess Policy is unambiguous are unpersuasive and would not have dictated a different result on the record before the Court when resolving a motion for summary judgment.

"Under Illinois law, '[a]n insurance policy is a contract, and the general rules governing the interpretation of other types of contracts also govern the interpretation of insurance policies.'" *Westfield Ins. Co. v. Vandenberg*, 796 F.3d 773, 777 (7th Cir. 2015), *quoting Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005)). As with any contract, "an insurance policy is construed according to the plain and ordinary meaning of its unambiguous terms." *Auto–Owners Ins. Co. v. Munroe*, 614 F.3d 322, 324 (7th Cir. 2010) (citing *Nicor, Inc. v. Associated Elec. & Gas*, 860 N.E.2d 280, 286 (Ill. 2006)). Ultimately, the Court's "primary

objective is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Westfield*, 796 F.3d at 777 (cleaned up). To do so, the Court must "construe the policy as a whole, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes of the entire contract." *Crum & Forster Managers Corp. v. Resolution Tr. Corp.*, 620 N.E.2d 1073, 1078 (Ill. 1993).

When evaluating a claim based on an insurance policy, the Court must first address whether the policy is ambiguous. A provision in an insurance policy is ambiguous if it is "subject to more than one reasonable interpretation." *Panfil v. Nautilus Ins. Co.*, 799 F.3d 716, 719 (7th Cir. 2015). If a policy's language is unambiguous, a court must interpret the policy according to the "plain, ordinary, and popular meaning." *Sokol and Co. v. Atlantic Mut. Ins. Co.*, 430 F.3d 417, 420 (7th Cir. 2005); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992). If a policy contains an ambiguous clause, the clause "must be construed in favor of the insured." *Menke v. Country Mut. Ins. Co.*, 401 N.E.2d 539, 541 (Ill. 1980). "However, if the provisions of the insurance policy are clear and unambiguous there is no need for construction and the provisions will be applied as written." *United States Fire Ins. Co. v. Schnackenberg et al.*, 429 N.E.2d 1203, 1205 (Ill. 1981).

For the reasons that follow, the Court finds that Great American's Excess Policy is ambiguous as to exhaustion. As it did in its initial motion for summary judgment, Great American first argues that the Excess Policy "clearly defines exhaustion" to require payout by the primary insurers, and therefore must be enforced as written. (Dckt. #147 at 17). It is true that the Court must apply unambiguous policy provisions as written. *Schnackenberg*, 429 N.E.2d at 1205. But Great American identifies no language within the four corners of the Excess Policy that unambiguously requires the primary insurers—or any particular party—to pay out the

primary layer. The Excess Policy's exhaustion clause requires only that "the limits of all underlying insurance, regardless of sublimits, have been exhausted by payment of loss or damage" before coverage is triggered. (PSOF ¶19). This differs from excess policy language expressly requiring payout by primary insurers, which other courts—including those in the various cases Great American cites—have found unambiguous. (*See* Dckt. #147 at 18); *see, e.g.*, *Coker v. Am. Guarantee and Liab. Ins. Co.*, 825 F.3d 1287, 1290 (11th Cir. 2016) (finding an excess policy unambiguous where it stated that "coverage under this policy will not apply unless and until the Insured or the Insured's underlying insurance has paid or is obligated to pay the full amount of the Underlying Limits of Insurance").

Nonetheless, Great American argues that the Excess Policy is unambiguous because it is a "'follow form' policy . . . expressly 'subject to the same terms and conditions' as the underlying policies." (Dckt. #147 at 20). Great American contends that those underlying policies unambiguously require payout only by the underlying insurers. But once again, Great American only supports its contention by pointing to language in the underlying policies that is at best ambiguous, and that does not specifically concern exhaustion or the limits of Koch's primary policies. (*See, e.g.*, DSOF ¶19) (identifying language in the primary policy under subheader "RESERVES AND LOSS PAYMENT" stating that "[a]ll insurers will be responsible for . . . issuing payments for their individual share of the measured loss in compliance with the policy terms and conditions contained therein"). Moreover, the language in Koch's primary policies is different from the language that other courts have found unambiguous, where that language (1) expressly pertained to depleting an underlying insurance limit and/or (2) expressly required the underlying insurer to exhaust the relevant limit of liability. *See, e.g.*, *Great Am. Ins. Co. v. Bally Total Fitness Holding Corp.*, No. 06 C 4554, 2010 WL 2542191, at *5 (N.D.Ill. June 22, 2010) (finding an umbrella policy unambiguous where it stated that "liability for any covered

Loss shall attach . . . only after the insurers of the Underlying Policies shall have paid" the full amount of their underlying limit); *Comerica Inc. v. Zurich Am. Ins. Co.*, 498 F.Supp.2d 1019, 1022 (E.D.Mich.2007) (finding a follow form excess policy unambiguous where it defined depletion of underlying limits to occur "solely as a result of actual payment of loss thereunder by the applicable insurers").

Great American's arguments fail to distinguish the circumstances in this case from those in *Trinity Homes*, where the Seventh Circuit found that the excess policy in question was "clear only insofar as it require[d] that the underlying . . . coverage be unavailable—either by exhaustion or denial of coverage—before [excess] coverage [was] triggered." 629 F.3d 653, 658 (7th Cir. 2010). Here, as in *Trinity*, "[w]hile the umbrella agreement does state that a[n underlying] policy is exhausted when the policy limit has been completely expended, it does not clearly provide that the full limit must be paid out by the [underlying] insurer alone." *Id.* As such, Great American's Excess Policy is ambiguous and susceptible to the meaning put forth by Koch—that it can be reached when Koch and an underlying insurer enter into a settlement agreement, and the insured obtains the remainder of its primary coverage from other parties.

So long as an insurance term or condition is ambiguous, Illinois law requires the Court to construe it in favor of the insured—in this case, Koch. *Menke*, 401 N.E.2d at 541.[2] Accordingly, Great American's motion to reconsider its exhaustion claim is denied, and Koch's motion for summary judgment on the same issue is granted.

---

[2] Great American also argues that the underlying policy was not exhausted because courts have "universally" rejected the argument that a below-limits settlement, such as Koch's settlement with Hannover, can satisfy the policy's exhaustion requirement. (Dckt. #147 at 18–19). Not so. In the cases that Great American relies on, the insured absorbed the gap that resulted from a below-limits settlement with its primary insurer. *See Comerica*, 498 F.Supp.2d at 1020; *Qualcomm, Inc. v. Certain Underwriters at Lloyd's, London*, 161 Cal.App.4th 184, 190 (2008). Here, by contrast, Koch undisputedly received the full $50 million in payments of its primary layer of insurance from a combination of its primary insurers and its brokers Alliance and RT. (PSOF ¶¶60–62).

### C. Great American Is Entitled to Summary Judgment on Its Depreciation Claim.

Finally, the Court considers Great American's depreciation claim. After the destruction of the Feed Mill, Koch expensed over $10 million representing the undepreciated Feed Mill acquisition cost during the period of liability. (DSAF ¶24). This included $5,635,332 that would have been reflected as depreciation expense in Koch's financial statements if Koch's business had not been interrupted. (*Id.*). Both parties argue that the policy is unambiguous about either requiring or prohibiting recovery for this depreciation expense, and both parties move for summary judgment on the issue. For the reasons that follow, the Court agrees with Great American and finds that it is entitled to summary judgment on this issue.

The underlying manuscript policy to which Great American argues its policy was a follow form policy reads, in relevant part:

> The Recoverable GROSS EARNINGS loss is the actual loss sustained by the insured due to the necessary interruption of the Insured's business during the PERIOD OF LIABILITY as respects "gross earnings" less all charges and expenses that do not necessarily continue during such interruption.
>
> In determining the Indemnity payable as the actual loss sustained by the Insured, the Company will consider the continuation of those normal charges and expenses that would have been incurred had no interruption of the Insured's business occurred."

(PSOF ¶75; DSAF ¶25).

The Court agrees with the parties that this portion of the policy is unambiguous, and the Court must construe unambiguous policy provisions as written. *Schnackenberg*, 429 N.E.2d at 1205. Here, the policy unambiguously defines "actual loss sustained by the Insured" as including those "normal charges and expenses that would have been incurred" had no business interruption occurred. (PSOF ¶75). It is also unambiguous in defining the relevant loss recoverable as "actual loss sustained by the Insured . . . less all charges and expenses that do not

necessarily continue during such interruption." (*Id.*). Like the policy at issue in *Cohen Furniture Co. v. St. Paul Insurance Co. of Illinois*, the policy here expressly excludes expenses that are unnecessary and noncontinuing during the period of interruption. 573 N.E.2d 851, 857 (Ill.App.Ct. 1991). And, as undisputed by Koch, depreciation is generally considered a *noncontinuing* expense in loss of earnings calculations for business interruption coverage. *Cohen*, 573 N.E.2d at 857 ("[D]epreciation allowance on a destroyed building is a charge which becomes unnecessary during the business interruption."); *Am. Ins. Co. v. Pickering Lumber Corp.*, 87 F.Supp. 512, 519 (N.D.Cal. 1949) ("In determining the actual loss, the defendant and the referees correctly excluded the item of depreciation on the destroyed sawmill, since this was not an item that must necessarily continue after the fire."); *155 N. High Ltd. v. Cincinnati Ins. Co.*, 599 N.E.2d 352, 358 (Ohio Ct.App. 1991) ("[D]epreciation is a noncontinuing charge or expense for the purpose of determining business interruption loss."). In short: under the clear language of the policy, defendant is not entitled to recover depreciation expenses on the Feed Mill.

As such, the Court thus grants summary judgment in favor of Great American on its depreciation claim and denies Koch's motion for summary judgment on the same.

## CONCLUSION

For the foregoing reasons, Great American's motion for summary judgment, (Dckt. #146), is granted in part and denied in part, and Koch's motion for summary judgment, (Dckt. #159), is granted in part and denied in part.

**DATE: September 30, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**